## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUSTIN NACHMAN, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>FANATICS, INC.; FANATICS, LLC; FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC.; FANATICS SPV, LLC; FANATICS HOLDINGS, INC.; MAJOR LEAGUE BASEBALL; MAJOR LEAGUE BASEBALL PROPERTIES, INC.; MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION; MLB PLAYERS, INC.; NATIONAL FOOTBALL LEAGUE; NFL PROPERTIES LLC; NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION; NFL PLAYERS, INC.; NATIONAL BASKETBALL ASSOCIATION; NBA PROPERTIES, INC.; NATIONAL BASKETBALL ASSOCIATION PLAYERS ASSOCIATION; ONETEAM PARTNERS LLC,<br><br>    Defendants. | CIVIL ACTION NO. _____<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION COMPLAINT |

Plaintiff Justin Nachman ("Plaintiff"), on behalf of himself and all others similarly situated (the "Classes" as defined in ¶¶ 122, 123 below), upon personal knowledge as to the facts pertaining to himself and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action to recover injunctive, monetary, and other appropriate relief. Plaintiff brings this action against Defendants Fanatics, Inc., Fanatics, LLC, Fanatics Collectibles Intermediate Holdco, Inc., Fanatics SPV, LLC, and Fanatics Holdings, Inc. (collectively, "Fanatics"); Major League Baseball ("MLB"); Major League Baseball Properties,

Inc. ("MLBP"); Major League Baseball Players Association ("MLBPA"); MLB Players, Inc.

("MLBPI"); National Football League ("NFL"); NFL Properties LLC ("NFLP"); National

Football League Players Association ("NFLPA"); NFL Players, Inc. ("NFLPI"); National

Basketball Association ("NBA"); NBA Properties, Inc. ("NBAP"); National Basketball Players

Association ("NBAPA"); and OneTeam Partners LLC ("OneTeam"), for their violations of

federal antitrust laws and state antitrust, consumer protection, and unjust enrichment laws.

## NATURE OF THE ACTION

1.     Plaintiff is an indirect purchaser of newly-issued MLB, NFL, and NBA trading

cards (collectively referred to herein as "Sports Cards") from retailers such as big-box stores

(e.g., Target and Walmart), hobby shops, or e-tail sites (e.g., Amazon and eBay) other than

Fanatics' or its subsidiaries' sites, for personal use and not for resale.

2.     The relevant market alleged herein is the United States market for Sports Cards

("Relevant Market").

3.     From August 2021 to the present, Fanatics—acting in concert with the other

Defendants—has schemed to monopolize the Sports Cards market. Fanatics has engaged in a

multitude of predatory conduct, including acquiring The Topps Company, Inc. ("Topps"), the

dominant supplier of baseball cards since the mid-twentieth century, and convincing the

Defendant sports leagues and players associations to enter into long-term exclusive licensing

agreements in exchange for shared monopoly profits.

4.     Those licenses give Fanatics the exclusive right to use the leagues' team names,

logos, uniforms, and other trademarks, as well as the name, image, and likeness ("NIL") of every

player on those teams.

5.     With the licenses in place, Fanatics has leveraged its market power—before the

licenses even took effect—to eliminate its only rival, Panini America Inc. ("Panini") from the market for NBA and NFL cards, thereby restricting consumer choice, diminishing product quality, and inflating prices for Sports Cards.

6.      It did so by, among other things, (a) acquiring Panini's primary card manufacturer, GC Packaging ("GCP"), and cutting off Panini's supply of NFL and NBA cards; (b) disparaging Panini and declaring it a "dead" business; (c) pressuring distributors, retailers, and other Sports Card sellers to stop buying and reselling Panini cards; (d) poaching Panini executives by threatening to blacklist them from the industry when Fanatics' exclusive licenses take effect; and (e) coercing pro athletes not to enter into licenses with Panini.

7.      Fanatics has also (a) imposed minimum price requirements on local card shops, forcing compliance under the threat of supply cutoff, which has led to higher prices and lower availability; (b) threatened to sever supply to shops that sell trading cards on business-to-business platforms, thereby limiting consumer choice; (c) coerced case breakers into using Fanatics' proprietary platform, Fanatics Live, by restricting their ability to acquire cases elsewhere, only to impose restrictive terms designed to push them out of business—leaving Fanatics as the sole operator in the space, further driving up prices and constraining supply; and (d) pressured major retailers to carry only Fanatics/Topps Sports Cards (and all other Fanatics trading cards), further suppressing competition and consumer options.

8.      The anticompetitive effects of Fanatics' brazen monopolization campaign have already harmed the Classes and—unless such campaign is enjoined--will worsen once its long-term exclusive licenses with the NBA take effect in September 2025 and the NFL in March 2026. Given the significant barriers to entry and the capital-intensive nature of the industry, the likelihood of meaningful competition in the Relevant Market is remote.

9.    Through its anticompetitive scheme, Defendants have restricted supply, reduced competition, and artificially inflated the prices of Sports Cards. As a result, Plaintiff and the Classes have suffered antitrust injury.

10.    Plaintiff seeks injunctive relief under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), and monetary damages under state law.

## PARTIES

### PLAINTIFF

11.    Plaintiff Justin Nachman resides in New York, NY. During the Class Period, Mr. Nachman purchased sports trading cards from a non-Defendant retailer, for personal use and not for resale.

### DEFENDANTS

12.    Fanatics, Inc. is a Delaware corporation headquartered in Jacksonville, FL. In January 2022, Fanatics, Inc. acquired Topps, a sports trading card manufacturer with a dominant share of the U.S. MLB trading card market.

13.    Fanatics, LLC, a Delaware-based LLC, also operates out of Jacksonville, FL.

14.    Fanatics Collectibles Intermediate Holdco, Inc., doing business as Fanatics Trading Cards, is a subsidiary of Fanatics Holdings, Inc., incorporated in Delaware and headquartered in Jacksonville, FL.

15.    Fanatics SPV, LLC is a Delaware LLC with its principal place of business in Jacksonville, FL.

16.    Though legally distinct entities, Fanatics, Inc.; Fanatics, LLC; Fanatics Holdings, Inc.; Fanatics Collectibles Intermediate Holdco, Inc.; and Fanatics SPV, LLC function as a

4

single, unified company under the "Fanatics" brand. The allegations set forth apply to each of these entities individually and collectively.

17.     Major League Baseball ("MLB") is an unincorporated association consisting of 30 Major League Baseball teams. It is headquartered in New York, NY.

18.     Major League Baseball Properties, Inc. ("MLBP"), also headquartered in New York, NY, manages the licensing of team names, marks, and logos, including those used by Fanatics and Topps.

19.     The Major League Baseball Players Association ("MLBPA") serves as the labor union representing Major League Baseball players. It is headquartered in New York, NY.

20.     MLB Players, Inc. ("MLBPI"), a subsidiary of MLBPA, is responsible for licensing MLB players' NIL. It is headquartered in New York, NY.

21.     The National Football League ("NFL") is an unincorporated association of 32 teams. It is headquartered in New York, NY.

22.     NFL Properties LLC ("NFLP"), a Delaware-based LLC with its principal place of business in New York, NY, oversees the licensing of NFL team names, marks, and logos, including for trading card companies.

23.     The National Football League Players Association ("NFLPA") is the labor union representing NFL players. It is headquartered in Washington, DC.

24.     NFL Players, Inc. ("NFLPI"), a subsidiary of the NFLPA, manages the licensing of NFL players' NIL. It is headquartered in Washington, DC.

25.     The National Basketball Association ("NBA") is an association of 30 teams. It is headquartered in New York, NY.

26.     NBA Properties, Inc. ("NBAP"), headquartered in New York, NY, is responsible

for licensing NBA team names, marks, and logos, including for use by trading card companies.

27.    The National Basketball Players Association ("NBAPA") is the labor union representing NBA players. It is headquartered in New York, NY. NBAPA also oversees the licensing of NBA players' NIL.

28.    Collectively, MLB, MLBP, NFL, NFLP, NBA, and NBAP are referred to as the "League Defendants."

29.    MLBPA, MLBPI, NFLPA, NFLPI, and NBAPA are collectively referred to as the "Player Association Defendants."

30.    OneTeam Partners, LLC, a Delaware corporation with its principal office in Santa Monica, CA, was established in 2019 as a joint venture between MLBPA and NFLPA.[1] It specializes in marketing and licensing the NIL of the athletes who are members of its affiliated players associations.

## JURISDICTION AND VENUE

31.    Plaintiff brings this action on behalf of the Nationwide Class (defined in ¶ 122 below) to enjoin Defendants from (a) fixing, maintaining, and/or stabilizing the price of Sports Cards, and (b) monopolizing and conspiring to monopolize the Relevant Market. Plaintiff brings this action on behalf of the Nationwide Class under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2). This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

32.    Plaintiff also brings this action on behalf of the Damages Class (defined in ¶ 123 below) to recover actual and/or compensatory damages, including double and treble damages as

---

[1] Since its founding, OneTeam Partners LLC has added additional player associations to the "OneTeam Family," including the WNBAPA, MLSPA, USRPA, and USWNTPA.

permitted by applicable state law. Plaintiff asserts claims pursuant to the common law of unjust enrichment and the state antitrust and consumer protection laws enumerated in Counts Four, Five and Six below. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds $5,000,000, exclusive of interest and costs, and in which some members of the Classes are citizens of a state different from some Defendants; and (ii) Plaintiff's state law claims form part of the same case or controversy as their federal claims under Article III of the U.S. Constitution.

33.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (c), and (d) because Plaintiff resides here, and because one or more Defendants resided or transacted business in this District and/or is licensed to do business and/or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

34.    This Court has personal jurisdiction over Defendants, as each of them is either incorporated, headquartered, markets and distributes Sports Cards, enters into contracts affecting the Relevant Market, and/or otherwise transacts business, in this District.

## INTERSTATE COMMERCE

35.    The U.S. Sports Card market operates at the national level.

36.    Fanatics has promoted and distributed its Sports Cards both online and through retail stores in all 50 states.

37.    Fanatics' Sports Card business relies on a continuous and uninterrupted flow of commerce across state lines.

38.    Through its anticompetitive practices—both independently and in concert with its

co-Defendants—Fanatics has significantly impacted interstate trade and commerce in the Relevant Market.

## FACTUAL ALLEGATIONS

### I.    The Relevant Market

####    A.    The Relevant Market for Sports Cards

39.    The relevant product market is newly-issued Sports Cards, which are trading cards bearing the NIL of MLB, NFL, and NBA players in their team uniforms, and their team logo, on one side of the card, and player information and statistics on the other side.

40.    In 2024, retail Sports Card sales exceeded $5 billion.

41.    The production of Sports Cards in the U.S. is heavily concentrated. Presently, only Fanatics and Panini[2] design, produce, market, and sell Sports Cards.

42.    Since Fanatics' January 2022 acquisition of Topps and the effective date of its exclusive licenses with the MLB and MLB Player Association Defendants in 2023, Fanatics has had an absolute monopoly in the MLB trading card market.

43.    The League Defendants control not only their own marks and logos, but the names, marks, and logos of all the leagues' teams. They do not, however, control the intellectual property in their players' NIL and cannot produce or sell any product that includes their players' NIL or autographs.

44.    The Player Association Defendants—through a group-licensing agreement with their member-players—generally control the group licensing of the intellectual property of its members and those members agree to significantly restrict their ability to enter into individual

---

[2] Panini, the U.S. branch of an Italian company established in 1961, entered the American trading card market in 2009. It did so by (1) securing a four-year exclusive licensing agreement with the NBA, which at the time controlled licensing rights for both the league and its Players' Association, and (2) acquiring Donruss Playoff L.P., a company that held non-exclusive licensing agreements with the NFL and NFLPA.

licenses.

45.     Accordingly, producing fully-licensed Sports Cards requires a license from both the League Defendants and a license from the Player Association Defendants (each referred to here as a "Major League License").

46.     If a supplier secures licenses from both a league and its player associations such that it can produce and sell fully-licensed Sports Cards, the licensee can also seek out other licenses to further enhance their production and sale of fully licensed sports trading cards. One of these further licenses is a license with an individual player.

47.     The group player rights licensed by the player associations typically include facsimile signatures of the players—rather than original, handwritten autographs that can be provided by players on an individual basis. This means a licensee can also add features to Sports Cards by contracting with an individual player for the right to use that player's original autograph, pieces of his uniforms, shoes, or bats, and his NIL on an individual rather than group basis.

48.     Trading cards of other league sports—such as the National Hockey League (NHL), Major League Soccer (MLS), the Women's NBA (WNBA), and college sports conferences (NCAA)—are marginal in comparison to the three major U.S. pro sports leagues. Even if NHL, MLS, WNBA, and NCAA trading cards are included in the Sports Card market, the market-definition, market-power, and competitive-effects allegations herein would remain unchanged.

49.     The trading cards of the other sports league players do not have meaningful cross-elasticity with Sports Cards. A small but significant non-transitory increase in the price of Sports Cards would not substantially raise demand for other sports trading cards or other types of

trading cards (e.g., Pokémon and other non-sports trading cards).

50.    The appropriate geographic market is the United States. Sports Cards are sold and distributed to customers throughout the United States, through both online stores and brick and mortar retail stores.

51.    Consumers generally purchase Sports Cards within their own country. Moreover, the interest in sports is generally country-specific, with the U.S. market focused on the Major U.S. Professional Sports Leagues, while foreign markets may favor other sports, such as cricket, rugby, or soccer. Thus, as to the market for Sports Cards, the relevant geographical area is the United States.

**B.    High Barriers to Entry in the Relevant Market**

52.    The Relevant Market has high entry barriers. Competing effectively requires significant brand recognition, capital, and industry know-how. Only the League Defendants and Player Association Defendants can offer the scale and credibility needed for a trading card manufacturer to succeed.

53.    Only 2 companies, Fanatics and Panini, produce Sports Cards. Only Fanatics produces MLB cards and will continue to be the sole producer of those cards as its Topps subsidiary has an exclusive license with MLB and MBLPA for 20 years and thereafter if renewed. When Fanatics' long-term licenses with NBA and NFL commence in September 2025 and March 2006, respectively, Fanatics will be the exclusive producer of Sports Cards for at least 10 and 20 years, respectively, and thereafter if those licenses are renewed.

54.    Panini managed to enter the market in 2009 by acquiring a major brand and securing the necessary licenses. But with Fanatics nearing total control, replicating that path is now virtually impossible—and will remain so for years, if not decades.

55. Thus, the long-term exclusive licenses the League and Player Association Defendants have granted to Fanatics has created an impenetrable barrier to entry by any prospective entrant and even by long-term rival Panini. In addition, high entry barriers have been erected by Fanatics' anticompetitive, exclusionary conduct, including its acquisition of GCP, the state-of-the-art trading card manufacturer once used by Panini, poaching of Panini executives, and coercing individual players to grant exclusive licenses in their autographs and other NIL.

## II. Anticompetitive Conduct

### A. Fanatics Enters into Long-Term Exclusive Dealing Agreements with the Leagues.

56. In August 2021, Fanatics announced it had acquired exclusive trading card licenses from the MLB, MLBPA, NBA, NBAPA, and NFLPA. It soon added the NFL, becoming the first company to hold exclusive rights to all six U.S. professional sports leagues at the same time.

57. Fanatics holds long-term exclusive licenses from the NFL, NFLPA, MLB, and MLBPA (20 years), and from the NBA and NBAPA (10 years). Such licenses are unprecedented in scope and duration.

58. These long-term exclusive deals give Fanatics control over the entire Sports Card market, and the ability to shut out competitors like Panini and increase the already high barriers to entry.

59. To obtain these licenses, Fanatics offered equity stakes to the League Defendants and Player Association Defendants in exchange for exclusivity. The combined equity stakes held by League Defendants and Player Association Defendants (and the NHL and MLS) are valued at $5–10 billion.

60. The MLBPA and NFLPA jointly negotiated and executed the Fanatics deals

through Defendant OneTeam.

61.     These exclusive, long-term agreements have effectively foreclosed competition in the Sports Card market for decades by depriving rivals of access to essential rights and resources needed to compete in the Relevant Market and do so for an unparalleled duration.

62.     These unprecedentedly lengthy agreements with the League Defendants and Player Association Defendants have resulted in extreme consolidation, giving Fanatics a singular grip over the Relevant Market.

63.     For the foreseeable future, one company—Fanatics—will control the entire Sports Card market for all teams in the MLB, NBA, and NFL. This dominance is not the result of superior innovation, business savvy, or chance, but rather a calculated strategy to exclude competition.

64.     Historically, licensing deals between sports leagues, player associations, and card manufacturers were short-term, typically lasting three to five years. This fostered ongoing competition for rights and incentivized companies to innovate and produce high-quality cards.

65.     Unlike Panini and prior players in the industry, no single company had ever held exclusive rights in all three major U.S. sports leagues at once.

66.     Fanatics has now accomplished what no other firm has: securing the exclusive rights to produce officially licensed Sports Cards for all major U.S. leagues and their player associations. This sweeping control creates a long-lasting barrier to entry, enabling Fanatics to raise prices above competitive levels and diminish consumer choice and quality without market consequences.

**B.    Fanatics Buys Topps for a Bargain Price.**

67.     Despite having had no prior Sports Card business, Fanatics secured exclusive

MLB and MLBPA licenses, effective after Panini's and Topps' deals expired at the end of 2022.[3]

68.    ESPN called the move "a blow to card giant Topps," which had been valued at $1.3 billion in 2020.[4] After stripping Topps of its key license, Fanatics acquired the company for a bargain. On or around January 4, 2022, Fanatics announced it had bought Topps from private equity firm Tornante for just $500 million. Fanatics' purchase price was a significantly reduced amount as compared to Topps' $1.3 billion valuation prior to Topps losing the MLB and MLBPA licenses.[5]

69.    The acquisition also gave Fanatics the exclusive MLS trading card license.

**C.    Fanatics Coerces Distributors, Big-Box Retailers, Independent Card Shops, and "Case Breakers."**

70.    Leveraging its monopoly power, Fanatics controlled the distribution of trading cards to big-box retailers and other major outlets. It pressured distributors supplying those retailers, demanding higher margins on Fanatics products. Distributors who resisted were threatened with losing access to licensed trading cards, jeopardizing their ability to meet retailer expectations for pricing and service.

71.    At the same time, Fanatics renegotiated terms with big-box retailers, requiring them to carry a limited range of trading card products, specifically those made or distributed by Fanatics through Topps. This action reduced the variety of trading cards available to consumers in major retail outlets, limiting consumer choice.

72.    Fanatics forced retailers and distributors to either comply with Fanatics' demands

---

[3] Fanatics Strikes Deal to Become Exclusive Licensee of MLB Cards, Aug. 19, 2021, ESPN, available at https://www.espn.com/mlb/story/_/id/32052284/fanatics-strikes-deal-become-exclusive-licensee-mlb-cards (last visited July 18, 2025)
[4] *Id.*
[5] Fanatics Acquires Topps Trading Cards for $500 Million, Jan. 3, 2022, CNBC, available at https://www.cnbc.com/2022/01/04/fanatics-acquires-topps-trading-cards.html (last visited July 18, 2025).

or risk losing access to the most popular cards in the future.

73.     Fanatics also leveraged its monopoly power to impose anticompetitive terms on local card shops. Similar to the distributors and big-box retailers, the local shops faced the choice of accepting Fanatics' restrictive terms or risk Fanatics cutting off their supply of highly sought-after trading cards.

74.     Fanatics imposed contracts on local card shops that allowed Fanatics to unilaterally set minimum prices for its trading cards at any time. Although these price floors were labeled as "suggestions," the contracts explicitly threatened suspension or termination of the shop's account for noncompliance. Because Fanatics will soon control the supply of NFL, NBA, and MLB cards, local shops had little choice but to follow these pricing demands to remain in business.

75.     Fanatics also pressured local card shops to avoid selling trading cards on business-to-business trading card websites. Shops that disregarded this threat faced the risk of losing their supply from Fanatics. This limitation restricted local shops' access to wider customer markets and reduced consumer options for purchasing trading cards.

76.     Another target of Fanatics' anticompetitive actions were "case breakers"—individuals or businesses who open sealed cases and packs of trading cards during livestreams.

77.     Case breakers rely on a steady supply of trading card cases to operate. Fanatics exploited this vulnerability by warning case breakers that they would lose access to trading card cases unless they switched to Fanatics' case-breaking platform, Fanatics Live, on highly restrictive terms that could force many out of business.

78.     This strategy advanced two anticompetitive goals. First, it forced case breakers to abandon established platforms and migrate to Fanatics Live, consolidating market activity under

Fanatics' control.

79.     Second, once case breakers were on Fanatics Live, Fanatics could exert further pressure to weaken or eliminate those not directly aligned with its interests, ensuring only those operating under Fanatics' terms would survive.

80.     This reduced the number of independent case breakers, limited consumer choice, and decreased the overall supply of case-breaking services.

81.     By forcing box-breaking business onto Fanatics Live, Fanatics, the sports leagues, and the player associations could profit from both the initial sale (to the breaker) and the secondary sale (to the participants).

**D.     Fanatics Acquires GC Packaging, LLC.**

82.     In March 2022, Fanatics acquired a controlling interest in GC Packaging, LLC ("GCP"). At the time, GCP was a critical vendor for Panini, providing advanced, customized card production services essential to competition in the Relevant Market.

83.     GCP was Panini's primary U.S. manufacturer and one of the few companies capable of meeting its high-quality, high-capacity and technical needs.

84.     Card production requires specialized equipment and expertise that ordinary printers lack. The process involves unique technologies vital to producing consumer-valued cards such as precise registration, foil stamping, lamination, and complex packaging. Adding materials like memorabilia makes production even more complex.

85.     Given the high value of rare cards, consumers demand precision. Only a few U.S. manufacturers can meet the required technical and security standards. GCP was the only one able to meet Panini's full production needs.

86.     GCP manufactured over 90% of Panini's U.S. trading cards under a contract that

prohibited a change in control without Panini's consent. Nonetheless, with full knowledge of GCP's contract with Panini, Fanatics acquired GCP without notifying or securing consent from Panini, in breach of that agreement.

87.     Fanatics acquired GCP to weaken Panini and remove it from the Relevant Market.

88.     The acquisition severely hindered Panini's ability to produce cards domestically, reducing competition.

89.     After the GCP deal, Fanatics' CEO Michael Rubin reportedly told Panini's CEO that Fanatics could halt Panini's production lines at will—and occasionally did so.

90.     Between 2019 and 2021, GCP met 91–99% of Panini's production targets.

91.     Before the acquisition, GCP projected it could produce 297 million packs in 2022 and 336 million in 2023.

92.     Instead, in 2022, it produced only 181 million packs—58% of Panini's needs—leaving a 116 million pack shortfall. In 2023, GCP met only 61% of demand, falling short by another 132 million packs.

93.     GCP repeatedly changed production schedules without explanation. In late 2022, it told Panini it could only complete 6–8 projects per month, ultimately delivering just 4 in November and 12 in December—well below the 20+ originally planned for each month.

94.     Fanatics' interference with GCP caused a shortfall of over 100 million packs, resulting in canceled orders and lost sales.

**E.      Fanatics Poaches Panini's Workforce, Destroying its Ability to Compete.**

95.     In furtherance of its strategy to monopolize the Relevant Market, Fanatics orchestrated a raid on Panini's design and marketing staff.

96.     Before launching the raid, Fanatics opened an office in Dallas, Texas—only a few

miles from Panini's headquarters. Beginning in April 2023, Fanatics hired thirty-six Panini employees. Notably, Fanatics first attempted to recruit Panini America's CEO, Mark Warsop, before targeting lower-level staff.

97.    Fanatics knew that Panini's employees were bound by employment agreements, which contained non-disclosure provisions barring the sharing of proprietary information and non-solicitation clauses prohibiting recruitment of fellow employees.

98.    Fanatics executed its raid by leveraging its market power (*see* ¶¶ 5, 42, 62, 63, 66, *supra*) and anticipated control over future exclusive licenses. It warned Panini employees that they would be blacklisted from the trading card industry once Panini lost its licenses, and that remaining at Panini would soon result in job loss as the company's business collapsed.

99.    To further pressure Panini's staff, Fanatics offered unusually high compensation packages that made economic sense only if viewed as part of a broader plan to eliminate Panini from the market ahead of the expiration of its NFL and NBA licenses.

100.    Fanatics encouraged former Panini employees to breach their non-disclosure and non-solicitation agreements, aiding in the misappropriation of Panini's trade secrets and facilitating the recruitment of additional Panini personnel.

101.    Fanatics did not need these employees to support its operations until at least 2025 and their early recruitment only made sense if Fanatics had already formulated and begun executing a plan to force Panini out of the Relevant Market well before its licenses expired.

**F.    Fanatics Causes the NFLPA to Terminate its License Agreement with Panini.**

102.    Fanatics knew Panini held an exclusive licensing agreement with the NFLPA, and that Fanatics' own exclusive deal was not set to begin until Panini's contract expired in 2025.

103.    That agreement included an acceleration clause, which provided that if the

NFLPA terminated its contract with Panini early, Fanatics' agreement would automatically and immediately take effect.

104.    Fanatics encouraged the NFLPA—and others—to manufacture a basis to claim that Panini had breached its contract, thereby triggering the acceleration clause and enabling Fanatics' agreement to begin early. The NFLPA had an incentive to do this given its prospective equity stake in Fanatics (*see* ¶ 59, *supra*).

105.    Fanatics' April 2023 employee raid was central to this scheme. Orchestrated by Fanatics, the raid gave the NFLPA a pretext to claim Panini had undergone a material change in executive management, justifying early termination of the agreement.

106.    Just as planned, in August 2023, the NFLPA terminated its licensing agreement with Panini.

107.    Following arbitration, a panel unanimously found that the NFLPA had breached its agreement with Panini and awarded Panini over $7 million in damages.

**G.    Fanatics Enters into Exclusive Deals with Star Players.**

108.    Handwritten autographs—particularly those of prominent rookies—are a key driver of demand in the trading card market. Securing exclusive rights to these autographs is therefore critical to offering desirable products.

109.    In April 2023, as part of its broader plan to eliminate Panini as its primary competitor, Fanatics began aggressively signing top rookie athletes to exclusive autograph contracts. Although Fanatics had already secured future exclusive licenses with the NBA and NFL, and their player associations, it sought to weaken Panini's position before those licenses took effect.

110.    Fanatics paid athletes not to autograph trading cards before its licenses took

effect, which prevented Panini from producing valuable autographed rookie cards during the final years of its NBA and NFL licenses.

111.    These exclusive agreements with rookie athletes deprive consumers of access to a full range of trading cards featuring NFL and NBA players. They are yet another example of Fanatics' anticompetitive conduct.

### H.    Fanatics Publicly Disparages Panini.

112.    Fanatics defamed Panini to three groups essential to Panini's operations under its existing licenses: (1) players, player agents, and representatives; (2) player associations; and (3) Panini's own employees. Fanatics falsely asserted that Panini lacked the capital to meet its obligations, was incapable of fulfilling its commitments, and was on the verge of going out of business—all in an effort to force Panini out of the market.

113.    Contrary to Fanatics' assertions, Panini had the financial resources and operational capacity to meet all its contractual obligations and remained the exclusive, licensed trading card partner of both the NBA and NFL.

114.    Fanatics targeted players and their representatives with these misrepresentations to discourage them from working with Panini and steer them toward exclusive deals with Fanatics—even if it meant abandoning Panini during the remainder of its valid licenses.

115.    In or around April 2023, Fanatics executives—including Michael Rubin, Mike Mahan, and Omar Wilkes—told major sports agencies such as CAA Sports and WME Sports (William Morris Endeavor) that Panini was about to lose its licenses with the NFL, NFLPA, NBA, and NBPA by June 2023, and would be unable to meet its obligations to athletes.

116.    Fanatics also made similarly false and disparaging statements to the players associations, seeking to pressure them into breaching their contracts with Panini.

**I.    Fanatics Cuts off Panini's Supply of Uniforms for use in its Cards.**

117.    Panini's trading cards stood out due to their inclusion of authentic player jersey pieces, making access to game-worn or player-used jerseys essential to remaining competitive. For many years, Panini sourced most of these jerseys from Fanatics.

118.    In or around May 2023, Fanatics CEO Michael Rubin informed Panini that Fanatics would no longer supply jerseys for use in Panini's trading cards. Since then, Panini has been unable to place any new jersey orders with Fanatics.

**III.    Anticompetitive Effects**

119.    Defendants' actions were intended to and did harm competition in the Sports Card Market, resulting in higher prices, reduced competition, and fewer product choices.

120.    Since Fanatics began executing its monopolization strategy, prices for Topps cards have climbed 50%, while comparable Panini cards have either held steady or declined.

121.    These are precisely the types of injuries antitrust laws are meant to prevent, and as a direct result of these anticompetitive actions, Defendants have caused antitrust injury to the Classes (*see* ¶¶ 63-65, 67, *supra*).

**CLASS ACTION ALLEGATIONS**

122.    Plaintiff brings this action on behalf of himself and as a class action under Fed. R. Civ. P. 23(a) and (b)(2), seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> **Nationwide Class:** All persons in the United States who purchased newly-issued Sports Cards from a retailer other than Fanatics or Topps during the period of January 1, 2022 until the date of trial (the "Class Period").

123.    Plaintiff also brings this action on behalf of himself and as a class action under

Fed. R. Civ. P. 23(a) and (b)(3), seeking damages, restitution, and equitable relief pursuant to

state antitrust, consumer protection, and unjust enrichment laws, on behalf of the following class

(the "Damages Class"):

> **Damages Class:** All persons in the Indirect Purchaser States[6] who, during the Class Period, purchased for personal use and not resale newly-issued Sports Cards from a retailer other than Fanatics or Topps.

124.    The Nationwide Class and Damages Class are referred to collectively as the

"Classes" unless otherwise indicated.

125.    Excluded from the Classes are Defendants and their officers, directors,

employees, affiliates, legal representatives, heirs, assigns or co-conspirators; and any judicial

officer presiding over this action and the members of his/her immediate family and judicial staff.

126.    **Numerosity**. Plaintiff does not know the exact number of the members of the

Classes. Due to the nature of the trade and commerce involved, Plaintiff reasonably believes

there are millions of members in each Class and that they are sufficiently numerous and

geographically-dispersed throughout the United States so that joinder of all Class members

would be impracticable.

127.    **Ascertainability**. The Class members are ascertainable through self-identification

in the Notice and claims process.

128.    **Typicality**. Plaintiff's claims are typical of other Class members' claims because

they were injured through Defendants' uniform misconduct and paid supracompetitive prices for

Sports Cards. Accordingly, by proving his own claims, Plaintiff will necessarily prove the other

---

[6] The "Indirect Purchaser States" are Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and Wyoming.

Class members' claims.

129.    **Common Questions Exist and Predominate**. Common legal or factual questions exist as to all members of the Classes. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was and is applicable to the Classes as a whole. These questions include the following:

a.    Whether Fanatics engaged in a monopolistic scheme to dominate the Relevant Market.

b.    Whether Fanatics' acquisition of Topps was aimed at monopolizing the Relevant Market.

c.    Whether Fanatics took concrete steps to drive its sole competitor, Panini, out of business and to gain monopoly power in the Relevant Market.

d.    Whether Fanatics abused its monopoly power by engaging in the exclusionary conduct alleged herein and raising and maintaining supracompetitive prices for newly-issued Sports Cards in the U.S.

e.    Whether Fanatics' exclusive agreements with the League Defendants and Player Association Defendants had anticompetitive effects.

f.    Whether Fanatics' exclusive agreements with the League Defendants and Player Association Defendants had any legitimate pro-competitive justification.

g.    Whether the anticompetitive effects of Fanatics' exclusive agreements with the League Defendants and Player Association Defendants outweigh any purported pro-competitive justifications.

h.     Whether the conduct described herein was used to maintain, preserve, or expand Fanatics' market power and monopoly over the Relevant Market.

i.     Whether the conduct described herein resulted in damages to members of the Damages Class in the form of overcharges on Sports Cards and the appropriate measure of those damages.

j.     The appropriate injunctive and equitable relief for the Class.

130.    **Adequacy**. Plaintiff will fairly and adequately represent and protect the Class members' interests and have no interests that conflict with or are antagonistic to those of the Classes. Moreover, Plaintiff's attorneys are highly capable and experienced in antitrust and class action litigation.

131.    **Superiority**. Class action treatment is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted because, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

132.    The prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

133.    Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

## COUNT ONE
### Violation of the Sherman Act, 15 U.S.C. § 2
### (On Behalf of the Nationwide Class for Injunctive and Equitable Relief)
### (Against Defendant Fanatics)

134.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

135.    Defendant Fanatics has engaged in a scheme to monopolize the Relevant Market.

136.    Fanatics willfully and wrongfully obtained and maintained monopoly power by using restrictive or exclusionary conduct, rather than using greater business acumen, in violation of 15 U.S.C. § 2.

137.    The Relevant Market is the U.S. Sports Card market, i.e., for newly-issued MLB, NBA, and NFL trading cards. The relevant geographic market is the United States.

138.    Plaintiff and the Nationwide Class have been injured, and will continue to be injured, by paying more for Sports Cards than they would have paid, and will continue to pay, in the absence of the combination and conspiracy as alleged herein.

139.    Plaintiff and the Nationwide Class are entitled to an injunction against Fanatics, preventing and restraining the violations alleged herein.

140.    Plaintiff and the Nationwide Class have suffered irreparable injury that remedies at law are inadequate to compensate.

141.    The balance of hardships supports issuing permanent injunctive relief, and the public interest is not disserved by a permanent injunction.

## COUNT TWO
### Violation of the Sherman Act, 15 U.S.C. § 2
### (On Behalf of the Nationwide Class for Injunctive and Equitable Relief)
### (Against Defendant Fanatics)

142.    Plaintiff incorporates and realleges, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

143.    Defendant Fanatics has engaged in a scheme, attempting to monopolize the Relevant Market.

144.    Fanatics willfully and wrongfully attempted to obtain and maintain monopoly power by using restrictive or exclusionary conduct, rather than using greater business acumen, in violation of 15 U.S.C. § 2.

145.    Fanatics' anticompetitive conduct has a high probability of monopolizing the Relevant Market.

146.    Plaintiff and the Nationwide Class have been injured, and will continue to be injured, by paying more for Sports Cards than they would have paid, and will continue to pay, in the absence of the combination and conspiracy as alleged herein.

147.    Plaintiff and the Nationwide Class are entitled to an injunction against Fanatics, preventing and restraining the violations alleged herein.

148.    Plaintiff and the Nationwide Class have suffered irreparable injury that remedies at law are inadequate to compensate.

149.    The balance of hardships supports issuing permanent injunctive relief, and the public interest is not disserved by a permanent injunction.

**COUNT THREE**
**Violation of the Sherman Act, 15 U.S.C. § 1**
**(On Behalf of the Nationwide Class for Injunctive and Equitable Relief)**
**(Against all Defendants)**

150.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

151.    The Defendants engaged in a hub and spoke conspiracy with Fanatics as the hub, and the other defendants as spokes, having entered into agreements with Fanatics to restrain

trade in the Relevant Market.

152.    Fanatics entered into long-term exclusive contracts with the MLB and MLBP that unreasonably restrains trade and forecloses competition in the Relevant Market.

153.    Fanatics entered into long-term exclusive contracts with MLBPA and MLBPI that unreasonably restrains trade and forecloses competition in the Relevant Market.

154.    Fanatics entered into long-term exclusive contracts with the NFL and NFLP that unreasonably restrains trade and forecloses competition in the Relevant Market.

155.    Fanatics entered into long-term exclusive contracts with the NFLPA and NFLPI that unreasonably restrains trade and forecloses competition in the Relevant Market.

156.    OneTeam had an instrumental role in orchestrating the long-term exclusive agreements between Fanatics on the one hand and MLBPA and NFLPA on the other. The Executive Directors of the MLBPA and the NFLPA said that the deal between Fanatics and MLBPA/NFLPA "never would have happened" if their organizations had not "joined forces to create OneTeam."

157.    Fanatics entered into long-term exclusive contracts with the NBA and NBAP that unreasonably restrain trade and foreclose competition in the Relevant Market.

158.    Fanatics entered into long-term exclusive contracts with the NBAPA that unreasonably restrain trade and foreclose competition in the Relevant Market.

159.    Defendants cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

160.    Plaintiff and the Nationwide Class have been injured, and will continue to be injured, by paying more for Sports Cards than they would have paid, and will continue to pay, in the absence of the combination and conspiracy as alleged herein.

161.    Plaintiff and the Nationwide Class are entitled to an injunction against Fanatics, preventing and restraining the violations alleged herein.

162.    Plaintiff and the Nationwide Class have suffered irreparable injury that remedies at law are inadequate to compensate.

163.    The balance of hardships supports issuing permanent injunctive relief, and the public interest is not disserved by a permanent injunction.

**COUNT FOUR**
**Violation of State Antitrust Statutes**
**(On Behalf of the Plaintiff and the Damages Class)**
**(Against all Defendants)**

164.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

165.    Defendants engaged in unfair competition, or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state unfair competition statutes listed below.

166.    During the Class Period, Defendants marketed, sold, or distributed Sports Cards and/or committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above.

167.    These acts of unfair competition consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the substantial terms of which were to prevent competition in the Relevant Market.

168.    For the purpose of forming and effectuating the unlawful trust, Defendants have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above.

169.    The combination and conspiracy alleged herein has had, inter alia, the following

effects: (1) competition in the sale of Sports Cards has been restrained, suppressed, and/or eliminated; (2) prices for such cards sold by Fanatics have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels; and (3) those who purchased such cards indirectly from Fanatics have been deprived of the benefit of free and open competition.

170.    As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their property in that they paid more for such cards than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' anticompetitive conduct, members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, as permitted by the statutes identified below.

171.    By reason of the foregoing, Fanatics has violated, and Plaintiff and members of the Damages Class are entitled to relief under:

     a.     Arizona, Ariz. Rev. Stat. § 44-1401, *et seq.*

     b.     California, Cal. Bus. & Prof. Code § 16700, *et seq.*

     c.     Colorado, Colo. Rev. Stat. §§ 6-4-101, *et seq.*

     d.     Connecticut, Conn. Gen. Stat. § 35-24, *et seq.*

     e.     D.C. Code § 28-4501, *et seq.*

     f.     Delaware Del. Code Ann. tit. 6, § 2101, *et. seq.*

     g.     Hawaii, Hawaii Rev. Stat. § 480-1, *et seq.*

     h.     Illinois, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011, *et seq.*

     i.     Iowa, Iowa Code § 553.1, *et seq.*

     j.     Kansas, Kan. Stat. Ann. § 50-101, *et seq.*

     k.     Maine, Maine Rev. Stat. tit. 10, § 1101, *et seq.*

l.      Maryland, Md. Code, Comm. Law § 11-201, *et seq.*

m.      Michigan, MCL § 445.773, *et seq.*

n.      Minnesota, Minn. Stat. § 325D.49, *et seq.*

o.      Mississippi, Miss. Code Ann. § 75-21-1, *et seq.*

p.      Nebraska, Neb. Rev. Stat. § 59-801, *et seq.*

q.      Nevada, Nev. Rev. Stat. § 598A.010, *et seq.*

r.      New Hampshire, N.H. Rev. Stat. Ann. tit. XXXI, § 356:1, *et seq.*

s.      New Jersey, N.J. Stat. Ann. § 56:9-11, *et seq.*

t.      New Mexico, N.M. Stat. Ann. § 57-1-1, *et seq.*

u.      New York, N.Y. Gen. Bus. Law § 340, *et seq.*

v.      North Carolina, N.C. Gen. Stat. § 75-1, *et seq.*

w.      North Dakota, N.D. Cen. Code § 51-08.1-01, *et seq.*

x.      Oregon, Or. Rev. Stat. § 646.705, *et seq.*

y.      P.R. Laws Ann. tit. 10 §§ 258, *et seq.*

z.      Rhode Island, R.I. Sat. § 6-36-1, *et seq.*

aa.     South Carolina, S.C. Code Ann. § 39-3-10, *et seq.*

bb.     South Dakota, S.D. Cod. Laws § 37-1-3.1, *et seq.*

cc.     Tennessee, Tenn. Code Ann. § 47-25-101, *et seq.*

dd.     Utah, Utah Code. Ann. § 76-10-3101, *et seq.*

ee.     Vermont, 9 V.S.A. § 2453a(a)

ff.     West Virginia, W.V. Code § 47-18-1, *et seq.*

gg.     Wisconsin, Wisc. Stat. § 133.01, *et seq.*

hh.     Wyoming, Wyo. Stat. Ann. § 40-4-101, *et seq.*

**COUNT FIVE**
**Violation of State Consumer Protection Statutes**
**(On Behalf of the Plaintiff and the Damages Class)**
**(Against all Defendants)**

172.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

173.    Defendants engaged in unfair competition, or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

174.    During the Class Period, Defendants marketed, sold, or distributed Sports Cards and/or committed and continue to commit acts of unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices specified above.

175.    These acts of unfair competition consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the substantial terms of which were to prevent competition in the Relevant Market.

176.    For the purpose of forming and effectuating the unlawful trust, Defendants have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above.

177.    The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) competition in the sale of Sports Cards has been restrained, suppressed, and/or eliminated; (2) prices for such cards sold by Fanatics have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels; and (3) those who purchased such cards indirectly from Fanatics have been deprived of the benefit of free and open competition.

178.    As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their property in that they paid more for such cards than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of

Defendants' anticompetitive conduct, members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, as permitted by the statutes identified below.

179.    By reason of the foregoing, Fanatics has violated, and Plaintiff and members of the Damages Class are entitled to relief under:

        a.        Arkansas, Ark. Code §§ 4-88-101, *et seq.*

        b.        California, California Bus & Prof. Code §§ 17200, *et seq.*

        c.        Florida, Fla. Stat. § 501.201, *et seq.*

        d.        Massachusetts, Mass. Gen. Laws, chapter 93A § 1, *et seq.*

        e.        Missouri, Mo. Rev. Stat. § 407.020.

        f.        Montana, Mont. Code, §§ 30-14-101, *et seq.*

## COUNT SIX
### Unjust Enrichment
### (On Behalf of Plaintiff and the Damages Class)

180.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

181.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Sports Cards.

182.    Defendants have benefited from their unlawful acts and it would be inequitable, based on unjust enrichment principles under the laws of each state in the United States as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff or the members of the Damages Class for Sports Cards.

183.    Plaintiff and the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the Damages Class may make claims on a pro rata basis.

184.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits from Defendants' sales of Sports Cards.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Classes, respectfully requests judgment against Defendants as follows:

(1)    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Fed. R. Civ. P., appoint Plaintiff as a Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Fed. R. Civ. P., be given to the Classes, once certified;

(2)    That the unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed:

a.    An unreasonable restraint of trade or commerce in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

b.    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition laws as set forth herein; and

32

    c.   Acts of unjust enrichment by Defendants as set forth herein;

(3)       That Plaintiff and the Damages Class recover damages and any other relief, to the maximum extent allowed under the applicable state laws, and that joint and several judgments in favor of Plaintiff and the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

(4)       That Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

(5)       That Plaintiff and the Damages Class be awarded pre-and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint;

(6)       That Plaintiff and the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

(7)       That Plaintiff and the Classes have such other and further relief as the case may require and the Court deems just and proper.

## **TRIAL BY JURY DEMANDED**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues so triable.

33

Dated: July 24, 2025                    Respectfully submitted,

                                        ___/s/ Gregory S. Asciolla

                                        Gregory S. Asciolla
                                        Alexander E. Barnett
                                        Jonathan S. Crevier
                                        **DICELLO LEVITT LLP**
                                        485 Lexington Avenue, Suite 1001
                                        New York, NY 10017
                                        (646) 933-1000
                                        gasciolla@dicellolevitt.com
                                        abarnett@dicellolevitt.com
                                        jcrevier@dicellolevitt.com

                                        Michael J. Boni (*pro hac vice forthcoming*)
                                        Benjamin J. Eichel (*pro hac vice forthcoming*)
                                        **BONI, ZACK & SNYDER LLC**
                                        15 Saint Asaphs Road
                                        Bala Cynwyd, PA 19004
                                        (610) 822-0200
                                        mboni@bonizack.com
                                        beichel@bonizack.com

                                        Jeffrey J. Corrigan
                                        Jeffrey L. Spector (*pro hac vice forthcoming*)
                                        **SPECTOR ROSEMAN & KODROFF, PC**
                                        Two Commerce Square
                                        2001 Market Street, Suite 3420
                                        Philadelphia, PA 19103
                                        Tel: (215) 496-0300
                                        jcorrigan@srkattorneys.com
                                        jspector@srkattorneys.com

                                        Kenneth A. Jacobsen (*pro hac vice forthcoming*)
                                        **JACOBSEN LAW OFFICES LLC**
                                        210 West Rittenhouse Square
                                        # 1404
                                        Philadelphia, PA 19103
                                        Tel: (610) 220-0131
                                        Jacobsenlaw@aol.com

                                        *Counsel for Plaintiff and members of the Classes*

34